JAMES YEAZEL

*v.*

JOHN T. ALEXANDER *et al.*

1. POLICE POWER OF A STATE—*prohibition of the importation of Texas and Cherokee cattle.* The act of February 27, 1867, to prevent the importation of Texas and Cherokee cattle into this State, as a means of protection

to native cattle, to which the former communicate a dangerous and fatal disease at certain seasons of the year, is a mere exercise of the police power of the State, which has never been delegated to the federal government, and which it is competent for the State to exercise.

2. Nor is the law obnoxious to the objection that it unnecessarily extends the prohibition to all seasons of the year, beyond the probable danger of infection. The power to impose some restraint existing, the courts will not declare the act void merely because the legislature may not, in that regard, have adjusted nicely the character of the prohibition. The statute is not an improper restraint upon the right to acquire, use, and dispose of property.

3. CONSTITUTIONAL LAW—*right to acquire, use and dispose of property.* The act is not an improper restraint upon the right to acquire, use, and dispose of property, as secured by the constitution.

4. JOINT AND SEVERAL—*liability for torts.* If several persons jointly commit a tort, some, or all, may be sued jointly, or one separately,—a tort being, in its nature, the separate act of each. But one is never liable for the tort of another, unless they act in concert; and several will not be held liable for the acts of one without co-operation, or their conduct naturally produced the acts which resulted in injury. Where the acts of different persons are entirely distinct and separate as to any aid, advice, counsel or countenance, from one to the other, there can not be a joint liability.

5. SAME—*as to injury caused by animals.* The same principles apply to cases of injury occasioned by animals owned by different persons. There must be a joint interest in the property, or concert in its use or management, or there can be no joint recovery.

6. So, where several owners of different droves of Texas and Cherokee cattle, drove their respective cattle over the herding ground of another, at different times, and by reason thereof, through one or the other, or both, of such droves, disease was imparted to cattle owned by the latter, it was *held,* there was no joint liability for such injury, of the several owners.

7. SAME—*assessment of damages severally.* In suits for torts against several, the damages can not be severally assessed; there can be only one assessment of damages.

8. SAME—*practice.* If damages in such case are assessed against two or more, when only one is guilty, the irregularity can only be cured by entering a *nolle prosequi* against all who are not guilty.

WRIT OF ERROR to the Circuit Court of Cumberland county; the Hon. HIRAM B. DECIUS, Judge, presiding.

Mr. C. B. SMITH, Mr. W. D. SOMERS and Messrs. GREEN & WOODS, for the plaintiff in error.

Mr. JOHN SCHOLFIELD, Mr. O. B. FICKLIN and Mr. E. L. SWEET, for the defendants in error.

Mr. JUSTICE THORNTON delivered the opinion of the Court:

This is an action on the case, brought to recover damages alleged to have accrued from a violation of an act of the legislature, approved February 27, 1867, and entitled "An act to prevent the importation of Texas or Cherokee cattle into the State of Illinois."

By the first section, it is provided, " That it shall not be lawful for any one to bring into this State, or own, or have in possession, any Texas or Cherokee cattle."

By the second section, it is provided that, "Any person who shall violate the provisions of this act, shall, for every such violation, forfeit and pay into the treasury of the county where the offense is committed, a sum not exceeding $1,000, or be both fined and imprisoned in the county jail, at the discretion of the court, though such time of imprisonment shall not exceed one year ; and such person or persons shall pay all damages that may accrue to any one by reason of such violation of this act."

The third section provides that the act shall not apply to any Texas or Cherokee cattle on hand at the time of the passage of this act, but that persons having such, shall be compelled to keep them within the bounds of their own premises, or separate from other cattle ; and any damage that may accrue from allowing such cattle to run at large, and thereby spreading disease among other cattle, shall be recovered from the owner or owners thereof, who shall be liable to all the pains and penalties as provided for in the second section of the act.

All the counts in the declaration, with the exception of the last, seek to recover damages for owning and having in possession Texas and Cherokee cattle, subsequent to the passage of the act, and which communicated the disease complained of. The last is a common law count, in which a *scienter* is alleged. The declaration is against four defendants, and the allegation

of ownership of the diseased cattle, and injury to cattle of plaintiff, is against all. The damages claimed are for joint torts.

It might, perhaps, be inferred from the evidence that two of the defendants had a joint possession of some of the cattle, but it is manifest from the proof that the other two defendants owned their cattle separately, and had no joint ownership or possession with their co-defendants. It is also apparent that the defendants drove their respective cattle over the prairie at different times, so that it is impossible to determine whose cattle communicated the disease.

The judgment in the circuit court was against the plaintiff.

It appears from the evidence that the cattle, the importation and ownership of which are prohibited, have the capacity, in some unknown and mysterious manner, to communicate disease to the native cattle of the State; that certain death follows in from six to eight weeks; that this disease was prevalent in the State, to some extent, prior to the passage of the law; that in 1868 it assumed an epidemic form, and in some localities almost all the native cattle died; that it becomes more virulent in dry and hot weather; that, in the opinion of some of the witnesses, it is not dangerous to import these cattle in the early spring, in winter, and in the fall; and that they thrive while the native cattle are dying around them.

From cotemporaneous history, we gather the knowledge of the capacity of Texas cattle to impart a disease which is surely fatal.

Able and ingenious arguments have been made, urging the unconstitutionality of the law. It is contended that it is in conflict with one of the expressly enumerated powers granted to Congress: "To regulate commerce with foreign nations, among the several States, and with the Indian tribes."

In the view we take, it is not necessary to discuss or decide this question. If the enactment is within the police power of the State, then the constitutional question is not involved.

17—58TH ILL.

Can the law be sustained as a police regulation? Each State has the unquestioned right to pass all laws necessary for the restraint and punishment of crime, the preservation of the public peace, and the health and morals of its citizens. By virtue of this power, the importation and sale of cards, dice, and billiard tables, are prohibited; the traffic in spirituous liquors regulated and suppressed; the vending of lottery tickets, the sale of unwholesome food or drink, and the making or manufacturing of poisonous candies, are made penal offenses.

Blackstone, 4th book, 168, enumerates, as within the powers of government to regulate, "All kinds of nuisances, (such as offensive trades and manufactures,) which, when injurious to a private man, are actionable; when detrimental to the public, are punishable by public prosecution; and particularly the keeping of hogs, in any city or market town, is indictable as a public nuisance. All disorderly inns or ale houses, bawdy houses, gaming houses, stage plays, unlicensed booths, and stages for rope-dancers, mountebanks and the like, are public nuisances, and may, upon indictment, be suppressed and fined;" and the making, keeping or carriage of too large a quantity of gunpowder at one time, or in one place or vehicle, are referred to the same head.

Under this power property may be destroyed, nuisances abated, and goods from a place where a contagious disease is prevalent, may be wholly excluded. Every species of infectious property—every thing manifestly injurious to the public health or morals—may be prohibited or removed. Even the importation of gunpowder, not on account of any qualities of taint, but from its explosive character, may be prevented. All such legislation would be a direct interference with trade, yet the power has never been questioned. It results from the law of self-preservation, which is inherent in every community. It is a right which has never been, and never can be delegated.

The State is under the same obligation, and possesses the same power to protect the property of the citizen from disease and death, as to preserve his morals and health. A State

powerless so to do, would excite our contempt instead of respect and pride.

It is true, as urged in the argument, that the power is not arbitrary or unrestricted. We can not recognize wholly unrestrained power in this country. We concede, too, that the discretion must be reasonable, and should not be exercised in such manner as to subvert natural and constitutional right. In a case of glaring abuse of power, the courts might properly interpose to arrest a remedy, which might be worse than the mischief proposed to be avoided. But where there is reasonable cause for the action of the legislative department, its determination ought not to be disturbed. Its motive in the enactment can not be inquired into. The facts and condition of things which render a law necessary for the public welfare, are generally to be judged of by the legislature.

What are the facts? Texas cattle impart disease; death is inevitable from the taint; an immense interest is endangered; thousands of cattle, roaming over our fertile and beautiful prairies, the basis of great wealth and essential to our sustenance, are threatened with destruction by a disease, mysterious, unseen and incurable. True, it may not be communicated during the winter. With such knowledge, is the legislature to pause for the purpose of adjusting nicely the character of the prohibition? There was power to impose some restraint; the restriction was not arbitrary, but was made in view of actual danger, and to prevent serious injury. Under such circumstances, the extent of the prohibition must be determined by the legislative department. To deny the power to pass the law in question, for the reason that the prohibition extended beyond the probable danger of infection, would compel this court to supervise, for slight cause, the entire legislation of the State. Such is not our province; and the presumption must be indulged that the legislature acted with wisdom and discretion, and a laudable desire for the protection of property.

We can not hold that the statute is any improper restraint upon the right to acquire, use, and dispose of property. This

is a natural right, and is also secured by constitutional provision. It can not, however, be enjoyed in a manner or under circumstances inconsistent with the reciprocal rights of others. In a state of organized society, and under a government of laws, rights are mutual. The extent of the enjoyment of one, depends on the effect thereby produced upon another. Even liberty is not unlicensed; it is regulated by law. Civil liberty would be a mere illusion, without proper restraints upon natural liberty. So, freedom in the acquisition and disposition of property, is, and must be, restricted for the general good. The right may be abridged or entirely taken away, if necessary, for the general welfare.

Counsel for defendants contend, that before there can be any denial of this right, the property condemned must be deemed injurious, uniformly, and from the general experience of mankind; that it must be a nuisance *per se.*

Legislation, by virtue of the police power, is an acknowledged right in the States, which has never been delegated to the national government. Under it, quarantine laws may be enacted, pauperism excluded, putrid and infected goods prohibited. If, upon examination, the courts ascertained that the quarantine was unnecessarily stringent, the pauperism not so great as indicated by the law, and the goods not so rotten and tainted as was supposed, but there was still an absolute necessity for some legislation, under such circumstances the legislation would not be declared void.

The police power is one of self-preservation, to be exercised by the State in its sound discretion, for the interest and safety of its citizens. The necessity of the law is one of legislative determination. The character of the remedy in such a case, where one is necessary, must be settled by the legislature. Whether the importation of the cattle should be permitted on conditions, or wholly prevented, were matters peculiarly within the province of the law-making power. There was danger to be apprehended to the property of citizens of the State; disease lurked upon her borders. Shall we inquire whether she

acted wisely and justly? Shall we supervise the legislation and substitute our discretion, in place of the discretion exercised by the legislature? This we can not do, without trenching upon the rights of a co-ordinate department of the State government. We are, therefore, of opinion that the legislature had the right, by virtue of the police power, to enact the law in question.

The other point presented in the argument, is the joint liability of the defendants for the several torts of their co-defendants. The declaration alleges joint ownership of the cattle, concert in driving them over the herding ground of the plaintiff, and joint action in the communication of the disease which resulted in the death of the cattle, for which suit is brought. The plea of not guilty negatived these allegations; their truth or falsity could only be developed by the evidence. Neither demurrer nor plea in abatement could properly have been filed.

If several persons are sued, and in point of law the tort could not be joint, they may demur, or move in arrest of judgment after verdict; or, a *nolle prosequi* may be entered, and the objection obviated. In such case, the objection must be apparent on the face of the declaration. If several persons jointly commit a tort, some, or all, may be sued jointly, or one separately; for a tort is, in its nature, the separate act of each. "Therefore, in actions in form *ex delicto* against one only, for a tort committed by several, he can not plead the non-joinder of the others in abatement, or in bar, or give it in evidence under the general issue; for a plea in abatement can only be adopted in those cases where all the parties must be joined, and not where the plaintiff may join them all, or not, at his election." 1 Chitty Plead. 87.

It is laid down in all works on pleading, that if two or more persons are sued for a tort committed by one only, a misjoinder can not be pleaded; the proper plea for those not guilty is the general issue. If one is sued for a joint tort by himself and others, the non-joinder can not be pleaded in

abatement. The reason is, a tort may be treated as joint, or several. Gould's Plead. book 5, secs. 117, 118 ; 1 Saund. 291, d. note 4. Therefore, neither the arguments submitted nor authorities cited upon the subject of misjoinder, are pertinent.

The proof, in this case, does not establish either a joint ownership, or the joint acts, which constitute the violation of law. Chitty lays down the rule, ",If, in legal consideration, the act complained of could not have been committed by several persons, and can only be considered the tort of the actual aggressor, or the distinct tort of each, a separate action against the actual wrong-doer only, or against each, must be brought." In this case, the proof clearly shows that the act complained of was the distinct tort of each defendant, so far as any wrong is proved.

It is the general rule, that where an act is done by the co-operation of several persons, they may be sued jointly or severally ; but one is never liable for the injury of another, unless they act in concert ; and several will not be held liable for the acts of one without co-operation, or their conduct naturally produced the acts which resulted in injury. Where the acts of different persons are entirely distinct and separate as to any aid, advice, counsel or countenance, from one to the other, there can not be a joint liability.

The same principles apply to cases of injury occasioned by animals owned by different persons. There must be joint interest in the property, or concert in its use or management, or there can be no joint recovery.

This has been repeatedly settled by the courts in our sister States. In *Partenheimer* v. *Van Order*, 20 Barb. 479, it was held, where cows, belonging to several owners, are found trespassing, each owner was liable for the trespass of his own cow, and no more.

In the case of *Van Steenburgh* and *Gray* v. *Tobias*, 17 Wend. 562, it was decided, a joint action would not lie against the separate owners of dogs, by whom sheep were killed.

In *Russell* v. *Tomlinson* and *Hawkins*, 2 Conn. 206, Chief Justice SWIFT said : "When the dogs of several persons do mischief, each owner is only liable for the mischief done by his own dog ; and it would be repugnant to the plainest principles of justice, to say that the dogs of different persons, by joining in doing mischief, could make the owners jointly liable." To the same effect are *Adams* v. *Hall* and *Cootwine*, 2 Vt. 9, and *Westgate* v. *Carr*, 43 Ill. 454.

None of the cases cited by plaintiff controvert the principle that, in actions *ex delicto*, the act charged must be the joint act of all the defendants, in fact or in legal intendment, to justify a joint recovery. If there were such, in our view of the law, we should not follow them as authority.

The case of *Frink et al.* v. *Potter*, 17 Ill. 406, has no analogy to the case under consideration. It merely decides, that in actions on the case against several, as stage proprietors, the rules applicable to actions *ex delicto* determine the rights of the parties ; that recovery may be had against all proved to be guilty ; and that the rule, *allegata et probata*, had no application. The guilt of all need not be proved, as in actions *ex contractu*.

The case of *Baker* v. *Michigan Southern & Northern Indiana R. R. Co.*, 42 Ill. 73, is not in point. It only re-asserts an old principle, that a tort committed by several is either joint or several, at the election of the party injured ; and that part, where several are sued, may be found guilty, and part not guilty.

It would be monstrous to hold one man responsible for injuries inflicted by another, when he did not co-operate or participate in the wrong.

Where several are sued in tort, and some are not guilty, the plaintiff must make his election. The proper course is to enter a *nolle prosequi* against the defendants not guilty, or have the jury find them not guilty.

We are strongly urged to establish the rule, allowing damages to be assessed severally against defendants in actions for

torts. To do so, would violate ancient and well settled practice. The cases cited in support are not in point; the opposite rule is a familiar one, and has been sanctioned by time and approved by the courts. In suits for torts against several, the damages can not be severally assessed; there can be only one assessment of damages. If they are assessed against two or more, when only one is guilty, the irregularity can only be cured by entering a *nolle prosequi* against all who are not guilty. Sedgwick on Damages, 581; Mayne on Damages, 329; 2 Arch. *Nisi Prius,* 54; *Holly* v. *Mix,* 3 Wend. 350; *Mitchell* v. *Millbank,* 6 Term, 199.

In the case at bar, the evidence does not disclose the guilty parties. It does not show whether the cattle of A, B, C or D, imparted the disease; and it wholly fails to connect the defendants with each other.

The judgment of the court below is affirmed.

*Judgment affirmed.*