## In re BARBER.

*(Circuit Court, D. Minnesota.  September 23, 1889.)*

CONSTITUTIONAL LAW—POLICE POWER—INTERSTATE COMMERCE—MEAT INSPECTION LAW.

Act Minn. April 16, 1889, prohibiting the sale within the state of dressed meat unless the animal from which it was taken was inspected by local inspectors appointed thereunder within 24 hours before slaughter, having the effect of excluding from sale all dressed meats from animals slaughtered outside of the state, is not a lawful exercise of the police power of the state, and is unconstitutional, as invading the power of congress to regulate interstate commerce, and as abridging the privileges and immunities of the citizens of other states.[1]

Petition for Writ of *Habeas Corpus.*

*W. H. Sanborn*, for petitioner.

*Mr. Cole* and *C. W. Bunn*, for the State.

NELSON, J. The petitioner is brought before me upon a writ of *habeas corpus.* He alleges in his petition that he is restrained of his liberty by the sheriff of Ramsey county under a warrant of commitment issued by a justice of the peace, being found guilty of violating the following act of the legislature of the state of Minnesota, approved April 16, 1889, entitled "An act for the protection of the public health by providing for the inspection, before slaughter, of cattle, sheep, and swine designed for slaughter for human food." "Be it enacted," etc.:

"Section 1. The sale of any fresh beef, veal, mutton, lamb, or pork for human food in this state, except as hereinafter provided, is hereby prohibited."

---

[1] For opinion of Judge JOHNSTON on the constitutionality of the Indiana statute, see note at end of case, post, 646.

Section 2 provides for the appointment of local inspectors. Section 3 defines the duties of the inspectors, who must inspect the animals within 24 hours before slaughter.

"Sec. 4. Any person who shall sell, expose, or offer for sale, for human food in this state, any fresh beef, mutton, lamb, or pork whatsoever, which has not been taken from an animal inspected and certified before slaughter by the proper local inspector appointed hereunder, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by fine of not more than $100, or by imprisonment not exceeding three months, for each offense."

The petitioner alleges that this act of the legislature is in contravention of the' constitution of the United States, and void, and that he is entitled to be discharged. The particular provisions of the constitution relied upon are article 1, § 8, which declares that "the congress shall have power * * * to regulate commerce * * * among the several states," and also, article 4, § 2, which provides that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." The proper proceedings are taken to form the issue. The counsel appearing on behalf of the state claim that the law was passed as a sanitary regulation under the power reserved to the states in article 10 of the constitution of the United States.

The question of the validity of the act is to be determined under the proceedings. Is the law a valid and lawful exercise of state power to protect the public health, or does it pass beyond the constitutional limit, invade the federal domain, and substantially prohibit or burden interstate commerce, and also violate the rights secured to the citizens of the several states? By its title the act purports to be for the protection of the public health, and it is urged that upon its face it does not deal with commerce, and does not directly invade the domain of interstate commerce, but merely regulates the mode of sale of an article of commerce, after it has become a part of the mass of the property of the state. The states have never yielded to the federal government control over internal commerce or their right to self-protection. They have plenary power to protect the lives, health, comfort, and safety of all persons, and for the protection of all property within the state. Health inspection and quarantine laws are among the recognized lawful legislation of a state, and are necessary and advisable for the public welfare. They are self-defensive, and no federal power is trenched upon by their enactment. Such laws may, in many instances, incidentally affect interstate commerce, yet are not necessarily a regulation of it. If the law of the state of Minnesota is a proper and reasonable exercise of its police power, it violates no provision of the constitution of the United States. There has been a conflict for many years and much litigation in respect to the extent of the powers reserved to the states in the federal constitution. This controversy is perennial. The supreme court of the United States has explained in many later cases its previous decisions in regard to the extent of the police power of the states; yet the line of demarcation between the delegated power of congress and the reserved powers of the

states is not defined with such accurate precision that it is easy to determine the boundary limit in all cases. But the supreme court always has stood firm, and tenaciously resisted every attempt of a state to encroach upon the exclusive power of the federal government under the commercial clause of the constitution, and there is a consension of opinion among the judges upon that subject.

The counsel for the state urges that this statute is a reasonably self-protective law. They put it forcibly in this form:

"Whatever the state deems it necessary to do within her own borders for the protection of the health of the citizen she may constitutionally do under the primal and paramount law of self-protection, which is nature's earliest enactment, to which no human legislation ever ran counter. Subject to this only qualification, that from facts apparent on the face of the law or of which the court may take judicial cognizance, the cogent presumptions in its favor are not overthrown by bad faith in its enactment."

If I clearly understand counsel, this is not an unfair statement of the reserved powers of the states. It is only this, in substance: a law to protect health may be enacted by a state, and is valid unless it is a usurpation upon the general government by the invasion of a power exclusively vested in congress. If a state arrogates power so delegated, and exercises control over a subject exclusively confided by the federal constitution to congress, it certainly is guilty of bad faith, for it violates that covenant by which we became one people. The states, as I said, are clothed with plenary police power and large discretion in its exercise for the protection of the public health and comfort, but in order to determine whether the act of the state is really a usurpation of power, the courts are required to look at the effect and operation of the law, and are not bound by mere form. In *Henderson* v. *Mayor*, 92 U. S. 259, Mr. Justice MILLER, speaking of the police power of the states, said:

"Whatever may be the nature and extent of that power, where not otherwise restricted, no definition of it and no urgency for its use can authorize a state to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of congress by the constitution. * * * It is clear, from the nature of our complex form of government, that whenever the statute of a state invades the domain of legislation which belongs exclusively to the congress of the United States, it is void; no matter under what class of powers it may fall, or how closely allied to powers conceded to belong to the states."

So, in *Mugler* v. *Kansas*, 123 U. S. 623, 8 Sup. Ct. Rep. 273, Mr. Justice HARLAN, speaking for the court, says:

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the state. There are of necessity limits beyond which legislation cannot rightfully go. * * * The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty, indeed are under a solemn duty, to look at the substance of things whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect

the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution. * * * Undoubtedly the state, when providing, by legislation, for the protection of the public health, the public morals, or the public safety, is subject to the paramount authority of the constitution of the United States, and may not violate rights secured or guarantied by that instrument, or interfere with the execution of the powers confided to the general government."

While it must be admitted that the line of distinction between what is a legitimate police regulation and what constitutes an interference with commerce is "dim and shadowy," it is settled that when a law reaches beyond its professed object and into the domain of the federal government, no matter what may be its title, or in what form the details are expressed, it is unconstitutional. The practical effect and operation of this law excludes the importation of all dressed meats to be sold for manufactured food from animals slaughtered outside of the state of Minnesota. It excludes without reference to its quality or condition a commodity known to be an article of commerce by the usages of a commercial world, and an important item of interstate traffic, and practically declares that it does not belong to commerce. It says to all persons engaged in the business of selling dressed meats for food in this state: You must have the animal from which the meat is taken inspected by local inspectors in the state within 24 hours before slaughtered, or suffer extreme penalties. It is not questioned that sound, dressed beef is an article of commerce, but this law is attempted to be maintained as a reasonable regulation of the mode of sale after it has become a part of the mass of property of the state, and it is urged that, as it does not forbid the importation of dressed meat, but only the sale for human food after importation, it is valid. In the argument counsel stated that "private families could import for their own consumption, and that innkeepers and like public resorts are not prevented from buying dressed meat outside of the state and bringing it in for use." If this is a correct interpretation of the law,—if individuals, for private use, as food, and innkeepers, who feed thousands of people, can freely import for use, and the sale is only forbidden,—how does such a measure protect the public health and promote the public welfare? Does it not conclusively show that the legislature was not influenced by considerations for the public health, safety, and comfort, but its policy was directed to other ends? The authorities, however, establish the propositions—*First*, that no article of commerce can be excluded from importation and sale in a state by the statutes like the one in question; *second*, that any act of a state interfering in any way with the free traffic between citizens of different states in any article of commerce is an attempted regulation of such commerce and an invasion of the power exclusively conferred upon congress, and its non-action with respect to any particular commodity is a declaration of its purpose that the commerce in that commodity shall be free. When this law is tested by the decisions of the supreme court of the United States it will be found that it oversteps the limit of the state ju-

risdiction and needlessly obstructs interstate commerce. In *Brown* v. *Maryland*, 12 Wheat. 447, Chief Justice MARSHALL, delivering the opinion of the court, said:

"There is no difference in effect between a power to prohibit the sale of an article and a power to prohibit its introduction into the country. The one would be a necessary consequence of the other. * * * If this power reaches the interior of a state, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse. One of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right not only to authorize importation, but to authorize the importer to sell."

The same principle was asserted in the *License Cases*, 5 How. 588. Mr. Justice McLEAN said:

"The federal government is supreme within the scope of its delegated powers, and the state governments are equally supreme in the exercise of those powers not delegated by them nor inhibited to them. From this it is clear that while these supreme functions are exercised by the federal and state governments within their respective limitations they can never come in conflict, and when a conflict occurs the inquiry must necessarily be, which is the paramount law? And that must depend upon the supremacy of the power by which it was enacted. The federal government is supreme in the exercise of powers delegated to it, but beyond this its acts are unconstitutional and void. So the acts of the states are void when they do that which is inhibited to them, or exercise a power which they have exclusively delegated to the federal government."

In *Railway Co.* v. *Husen*, 95 U. S. 465, the court said:

"We admit that the deposit in congress of the power to regulate commerce among the states was not a surrender of that which may properly be denominated 'police power.' What that power is it is difficult to define with sharp precision. It is generally said to extend to making regulations promotive of domestic order, morals, health, and safety. * * * But, whatever may be the nature and reach of the police power of a state, it cannot be exercised over a subject confided exclusively to congress by the federal constitution. * * * Neither the unlimited powers of a state to tax, nor any of its large police powers, can be exercised to such an extent as to work a practical assumption of the powers properly conferred upon congress by the constitution. * * * While we unhesitatingly admit that a state may pass sanitary laws and laws for the protection of life, liberty, health, or property within its borders; while it may prevent persons and animals suffering under contagious or infectious diseases, or convicts, etc., from entering the state; while, for the purposes of self-protection, it may establish quarantine and reasonable inspection laws,—it may not interfere with the transportation into or through the state beyond what is absolutely necessary for its self-protection. It may not, under cover of exerting police powers, substantially prohibit or burden either foreign or interstate commerce."

So, in *Bowman* v. *Railway Co.*, 125 U. S. 465, 8 Sup. Ct. Rep. 689, 1062, Mr. Justice MATTHEWS, speaking of police power of the state, says:

"If from its nature it does not belong to commerce, or if its condition, from putrescence or other cause, is such when it is about to enter the state that it no longer belongs to commerce, or, in other words, is not a commercial article, then the state power may exclude its introduction. And as an incident to this power a state may use means to ascertain the fact. And here is the limit between the sovereign power of the state and the federal power; that is to say, that which does not belong to commerce is within the jurisdiction of the police power of the state, and that which does belong to commerce is within the jurisdiction of the United States."

I forbear further quotation, and refer to the opinion of the court in full.

Undoubtedly the state may provide for the reasonable inspection of dressed meat or any article of commerce, and prohibit its introduction into the state if found in fact unwholesome and unfit for use as food, but it cannot encroach upon the power of congress to regulate interstate commerce. It cannot go to the extent of prohibiting the introduction of a sound commercial commodity. A state may exclude any infected article of commerce from reaching the importer, but this law excludes the sound and infected alike, and declares it unfit for human food under the guise of a health regulation. Such a law transcends the police power of a state, for it attempts to obstruct commerce, and if it can exclude sound, dressed meat, it may prohibit the importation and sale of any commodity, and, as said, thus "commercial anarchy and confusion would result from the diverse exertions of power by the several states of the Union." The case of *Powell* v. *Pennsylvania*, 127 U. S. 678, 8 Sup. Ct. Rep. 992, 1257, does not overrule the decisions above cited. No conflict arose in that case between the police power of the state and the power of congress to regulate interstate commerce, and nothing therein said is inconsistent with the previous decisions of the court in regard to the commercial clause of the constitution. That the law violates article 4, § 2, I think is manifest from the preceding quotations and the authorities cited by counsel. *Ward* v. *Maryland*, 12 Wall. 418; *Tiernan* v. *Rinker*, 102 U. S. 123; *Walling* v. *Michigan*, 116 U. S. 446, 6 Sup. Ct. Rep. 454; *In re Watson*, 15 Fed. Rep. 511. I have come to the conclusion that the law is not a proper and lawful exercise of the police power of the state, and is unconstitutional. The petitioner is discharged.

---

The following is the opinion of Hon. WILLIAM JOHNSTON in the circuit court for Porter county, Ind., which is published in this connection on account of the similarity of the Indiana statute to the Minnesota statute discussed in the above cases:

### JAMES E. HARVEY *v.* THOMAS HUFFMAN.

JOHNSTON, J. The petition in this case states that James E. Harvey was, on the 19th day of June, 1889, in the city of Hammond, offering to sell, and selling, fresh meat of an animal slaughtered in the state of Illinois, and which animal had not been inspected by the inspector of the city of Hammond, or in Lake county, Ind., before such slaughter; that on the said day he was arrested for such sale and so offering to sell, taken before a magistrate, tried, convicted, and fined; that he refused to pay or replevy such fine, and that a *mittimus* was issued to commit him to the jail of Lake county; that the defend-

ant in the case is the officer to whom said *mittimus* was issued, and who has the peti-
tioner in custody, preparatory to his incarceration in the jail. He therefore prayed
that a writ of *habeas corpus* might issue, which writ was granted, issued, served, and
made returnable on June 24th. The defendant, in his return to the writ, admits the
foregoing facts, and with such return sets up a copy of the proceedings had before the
magistrate. To this return the petitioner files his exceptions, putting in question the
constitutionality of the act of the legislature under which he was arrested and fined,
and which is as follows: "Section 1. It shall be illegal to sell, or offer or expose for
sale, in any incorporated city within the state, beef, mutton, lamb, or pork for human
food, except as hereinafter provided, which has not been inspected alive within the
county by an inspector or his deputy, duly appointed by the authorities of said county in
which said beef, mutton, lamb, or pork is intended for consumption, and found by such
inspector to be pure, healthy, and merchantable; and for every such offense the accused,
after conviction, shall be fined not more than two hundred dollars, nor less than ten.
Sec. 2. That the city council is hereby empowered and required to appoint in each in-
corporated city within the county, one or more inspectors and deputies, furnish the
necessary blanks, and decree the fees for such inspection: provided, that where farm-
ers slaughter cattle, sheep, or swine of their own raising or feeding for food, no other
inspection shall be required, or penalty enforced, than such as are already provided by
law to prevent the sale and consumption of diseased meats. Sec. 3. Nothing herein
contained shall prevent or obstruct the sale of cured beef or pork known as dried, cured,
or canned beef, or smoked or salted pork, or other cured or salted meats. "

Section 1119, St. Ind. 1881, provides, among other things, that "no court shall have
power to inquire into the legality of the judgment or process whereby any party is in
custody upon any process issued on any final judgment of a court of competent juris-
diction. " This might at first blush appear to deprive this court of authority to issue
the writ; but, notwithstanding this provision, the validity of a judgment may always
be assailed on the ground that the act of the legislature under which the indictment
was found is unconstitutional. An unconstitutional law is void, and is no law. The
offense created by it is not a crime, and conviction under it is illegal and void. Ex
parte Siebold, 100 U. S. 371. If this statute is constitutional and valid, then the relief
prayed for cannot be granted; otherwise the petitioner is entitled to the benefit of the
writ, and should be discharged. Courts are loath to interfere, and should be very
guarded and careful in rendering any opinion that destroys the effect of an act of the
legislature; but when such act is clearly unconstitutional they should not hesitate so
to pronounce it.

I shall first consider the case with reference to the first exception to the return. If
the act in question does not interfere with interstate commerce, then, as to that excep-
tion, it is valid. If it does so interfere, it is an assumption of power on behalf of the
state beyond its authority, and is unconstitutional and void. It was this exercise of
power by the several states over matters which could only be safely intrusted to na-
tional authority which rendered the original articles of confederation only a rope of
sand; and the confusion produced by the hostile interests of the several states led to
*he adoption of our present constitution. As Chief Justice MARSHALL has stated the rule
on the subject: "The oppressed and degraded state of commerce previous to the adop-
tion of the constitution can scarcely be forgotten. It was regulated by foreign nations,
with a single view to their own interests; and our disunited efforts to counteract their
restrictions were rendered impotent by want of combination. Congress, indeed, pos-
sessed the power of making treaties, but the inability of the federal government to en-
force them had become so apparent as to render that power in a great degree useless.
Those who felt the injury arising from this state of things, and those who were capable
of estimating the influence of commerce, on the prosperity of nations, perceived the ne-
cessity of giving the control over this important subject to a single government. It
may be doubted whether any of the evils proceeding from the feebleness of the federal
government contributed more to that great revolution which introduced the present
system than the deep and general conviction that commerce ought to be regulated by
congress. It is not, therefore, a matter of surprise that the grant should be as exten-
sive as the mischief, and should comprehend all foreign commerce and all commerce
among the states. To construe the power so as to impair its efficacy would tend to de-
feat an object in the attainment of which the American public took, and justly took,
that strong interest which arose from a full conviction of its necessity. " Brown
v. Maryland, 12 Wheat. 446. The provision referred to in the constitution of the
United States is section 8, art. 1, which provides that congress shall have the power
"to regulate commerce with foreign nations and among the several states. " Any law,
then, of any state, which contravenes this provision of the constitution, is null and void.
Does, then, this statute of Indiana attempt to regulate, or does it interfere with, inter-
state commerce? True, it is entitled an act for the protection of the public health by
promoting the growth and sale of healthy cattle and sheep; yet, in whatever language
a statute may be framed, its purpose and its constitutional validity must be determined
by its natural and reasonable effect. This statute amounts to a prohibition against the
introduction into our state for consumption of all dressed fresh meats. None other can
be marketed in our cities except such as has been inspected alive within the bounds of

the county and state in which the city is situated, or such as farmers within the state may have raised or fed and slaughtered. It is well known that dressed fresh meat has become an important article of commerce, and is quite extensively shipped from one state to another, as well as into foreign countries. In fact, in very many of our cities our meat markets are largely supplied with fresh meats shipped from adjoining states. It is, then, judged by the authorities on the question, an article of interstate commerce. Whenever an article has begun to move as an article of trade from one state to another, commerce in that commodity between the states has begun. The Daniel Ball, 10 Wall. 557; Kidd v. Pearson, 128 U. S. 11-25, 9 Sup. Ct. Rep. 6. That the transportation of property from one state to another is a branch of interstate commerce is undeniable. Railroad Co. v. Husen, 95 U. S. 469. In Webster's Unabridged Dictionary "commerce" is defined as "the exchange of merchandise on a large scale between different places or communities." This embraces two distinct ideas: First, that of exchange in its largest sense, including barter,—the giving of one commodity for another; and sale,—the exchange of an article of property for money, the representative of all values. From this definition it will be seen that there can be no commerce unaccompanied by exchange or sale. The other idea embraced in the definition is that of transportation; for, to constitute commerce, the exchange must be between different places or communities; and any law that either prevents the transportation or sale of merchandise totally destroys commerce by the exercise of that power alone. Commerce, then, involves the idea of carrying the commodity intended for exchange to another place, where, as we may say, the market is to be held, and the sale accomplished. Hence, without both transportation and liberty of sale, there can be no interstate commerce.

No power of congress has been more jealously guarded against usurpation than this; and the attempt of different states in varied form to invade it in pursuit of some partial and temporary advantage, and the uniform and wise ruling of the supreme court of the United States against all attempts to evade and avoid this exclusive power of the national legislature, is one of the most interesting subjects of federal jurisprudence. In 1872 the legislature of Missouri passed an act providing that no Texas, Mexican, or Indian cattle should be driven or otherwise conveyed into or remain in any county of the state between the 1st day of March and the 1st day of December in each year, except as the same were conveyed through the state by railroad or steam-boat. This statute, in practical effect, is not far different from the one under consideration. Each, in effect, amounts to a prohibition of certain articles of commerce. The supreme court of the United States pronounced this statute an invasion of the exclusive power of the national legislature, an interference with interstate commerce, and therefore unconstitutional and void. Railroad Co. v. Husen, 95 U. S. 465. In this case the court says: "It is a plain regulation of interstate commerce,—a regulation extending to prohibition. Whatever may be the power of a state over commerce that is completely internal, it can no more prohibit or regulate that which is interstate than it can that which is with foreign nations. Power over one is given by the constitution of the United States to congress in the same words in which it is given over the other, and in both cases it is necessarily exclusive." Again, the court says: "Transportation is essential to commerce, or, rather, it is commerce itself; and every obstacle to it, or burden laid upon it, by legislative authority, is regulation." A like statute of the state of Illinois was for a like reason held void in Salzenstein v. Mavis, 91 Ill. 391, overruling the prior case of Yeazel v. Alexander, 58 Ill. 254. To the same effect with the foregoing are the following authorities: Bowman v. Railroad Co., 125 U. S. 465, 8 Sup. Ct. Rep. 689, 1062; Case of State Freight Tax, 15 Wall. 232; Ward v. Maryland, 12 Wall. 418; Welton v. State of Missouri, 91 U. S. 275; Henderson v. Mayor of New York, 92 U. S. 259; Chy Lung v. Freeman, Id. 275; Mining Co. v. Auditor General, 32 Mich. 488.

Again, the power vested by the constitution in congress to legislate upon the subject of interstate commerce not only extends to the transportation, but to the power and right to vend, the articles of commerce when transported to their destination. On this subject Chief Justice MARSHALL says, in Brown v. Maryland, 12 Wheat. 446, 447: "If this power [to regulate commerce] reaches the interior of a state, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse; one of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms with the intent that its efficacy should be complete, should cease at the point where its continuance is indispensable to its value. To what purpose should the power to allow importation be given unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right not only to authorize importation, but to authorize the importer to sell." The power vested in congress by the constitution governs property which is transported as an article of commerce from foreign countries, or among the states, from hostile or interfering state legislation, until it has mingled with and become a part of the general property of the country, and protects it even after it has entered a state

from any burden imposed by reason of its foreign origin. Welton v. State of Missouri, 91 U. S. 275. It may, however, be contended that the act in question is a proper exercise of the police power of the state, and as such ought to be upheld. As a police power of the state in its range comes very near the field committed by the constitution to congress, it is the duty of the courts to guard vigilantly against any intrusion. "What the police power is it is difficult to define with sharp precision. It is generally said to extend to making regulations promotive of domestic order, morals, health, and safety." Railroad Co. v. Husen, 95 U. S. 470, 471. It extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property, within the state. Thorpe v. Railroad Co., 27 Vt. 149. "It may also be admitted that the police powers of a state justify the adoption of precautionary measures against social evils. Under it a state may legislate to prevent the spread of crime or pauperism, or disturbance of the peace. It may exclude from its limits convicts, paupers, idiots, and lunatics, and persons likely to become a public charge, as well as persons afflicted by contagious or infectious diseases, * * * and would justify the exclusion of property dangerous to the property of citizens of the state; for example, animals having dangerous or infectious diseases. * * * But whatever may be the nature and reach of the police power of a state, it cannot be exercised over a subject confined exclusively to congress by the federal constitution. It cannot invade the domain of the national government. Railroad Co. v. Husen, 95 U. S. 471; Salzenstein v. Mavis, 91 Ill. 391. It is, then, no answer to the charge that such regulation of commerce by a state is forbidden by the constitution, to say that it falls within the police power of the state; for, to whatever class of legislative powers it may belong, it is prohibited to the states, if granted exclusively to congress by that instrument. In Graffty v. City of Rushville, 107 Ind. 511, 8 N. E. Rep. 609, our own supreme court says: "The conclusion plainly deducible from the decision is that neither states nor municipalities can enforce any law or ordinance the effect of which is to embarrass commercial communication between the different states, or to discriminate against the products of one state, or exact licenses from persons residing in foreign states which are not required of its own citizens under like circumstances." In the case of Telegraph Co. v. Pendleton, 95 Ind. 12, the court says: "We think, however, that the ultimate conclusion deducible from the later decisions is that the states cannot embarrass commercial communication, abridge the freedom of commerce, discriminate in favor of the products of one state, lay burdens upon the instruments of commerce, or exact licenses from persons * * * engaged in interstate commerce." In Bowman v. Railroad Co., 125 U. S. 465–494, 8 Sup. Ct. Rep. 689, 1062, the supreme court of the United States says, in discussing the Iowa prohibitory statute: "If the state of Iowa may prohibit the importation of intoxicating liquors from all other states, it may also include tobacco, or any other article the use or abuse of which it may deem deleterious. It may not choose even to be governed by considerations growing out of the health, comfort, or peace of the community. Its policy may be directed to other ends. It may choose to establish a system directed to the promotion and benefit of its own agriculture, manufactures, or arts of any description, and prevent the introduction and sale within its limits of any or all of articles that it may select as coming into competition with those which it seeks to protect. The police power of the state would extend to such cases as well as to those in which it was sought to legislate in behalf of the health, peace, and morals of the people. In view of the commercial anarchy and confusion which would result from the diverse exertions of power by the several states of the Union, it cannot be supposed that the constitution or congress have intended to limit the freedom of commercial intercourse among the people of the several states." It would hardly be expected that such a court would hold that a state may not restrict traffic in alcohol, (which possesses no virtue for food or drink,) but may absolutely prohibit all commerce in fresh meats.

The act of the legislature under consideration makes no distinction between the good and bad, but all alike is indiscriminately condemned. The act provides that all uncured meat from every other state, the good, the pure, and the wholesome, with the tainted and the diseased, shall alike be excluded from the cities of the state; and this, it is said in the title of the act, "for the protection of the public health." The third section of the act provides "that nothing herein contained shall prevent or obstruct the sale of cured beef or pork known as dried, cured, or canned beef, or smoked or salted pork, or other cured or salted meats." Note the use of the word "prevent" in this section. Its employment here tends to the conclusion that the legislature understood the first section had prohibited the sale of uncured meats from other states. It was this which, in the opinion of the law-makers, rendered the proviso necessary, saving other meats from its operation. By this third section all kinds of meats, cured, salted, smoked, or dried, no matter how badly the animals from which they were taken were diseased, nor from whence they came, are welcome to admission, and the market is open and free. Thus pure, dressed, fresh beef is excluded, and tainted and diseased canned, salted, smoked, and dried meats are invited. It seems apparent that the purpose of the act was to exclude foreign dressed meats from the city markets of Indiana; and, if such be the case, a consideration of the police powers of the state is unnecessary. Nor can the legislation be sustained as a mere inspection law. The state of Indiana need not admit to her markets meat which is unfit for human food, and she

may take such steps as are necessary to ascertain whether or not it is so. When she has ascertained that it is non-commercial, she may exclude it; but no declaration, however solemn, and no pretext, however specious, will authorize her to exclude a product which is pure and harmless. It does not provide for the inspection of the commodity for the purpose of ascertaining its quality. It proceeds upon the theory that all uncured meat is noxious and injurious to health. It excludes it in advance and without examination to ascertain its condition. It pronounces a judgment without a hearing. All uncured meat is condemned, interdicted, excluded. It has never been regarded as within the legitimate scope of the inspection laws to forbid trade in respect to any known article of commerce, irrespective of its condition and quality, merely on account of its intrinsic nature and the injurious consequences of its use or abuse. The very meaning of inspection is that there should be an examination, and not an exclusion without a hearing. The object of inspection laws is to improve the quality of the articles produced by the labor of a country to fit them for exportation, or it may be for domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose. Turner v. Maryland, 107 U. S. 38, 2 Sup. Ct. Rep. 44; Gibbons v. Ogden, 9 Wheat. 203. They are deemed necessary to fit the inspected article for the market by giving to the purchaser public assurance that the article is in that condition and of that quality which makes it merchantable, and fit for use or consumption. They are not founded on the idea that the things in respect to which inspection is required are dangerous and noxious in themselves. Bowman v. Railroad Co., 125 U. S. 465, 8 Sup. Ct. Rep. 689, 1062. If the state of Indiana has the power to enforce such a statute, then with equal propriety it may exclude every other product of interstate commerce. It may exclude flour for the reason that the grain from which it was ground was not inspected within the county and state where it is to be consumed; sugar, because it is produced and refined in another state; fruits, because our own soil will or will not produce them; in fact, everything shipped us for home comfort and consumption. And so likewise may other states prohibit the shipping of those articles into our state. The great state of Pennsylvania may prohibit the introduction of its coal into our state; Illinois may prohibit the shipping of its merchandise to us; Michigan, her fruits and lumber; and so on. This policy might thus be extended until in effect we would become as isolated and walled in as a Chinese city.

Another provision of the constitution of the United States with which this act appears to come in conflict is section 2, art. 4: "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." Inasmuch as a resident of the county—for example, of Lake county—is entitled to have his animal inspected at home on his own premises, and the citizen or resident of Porter county, Ind., or of Cook county, Ill.,—each adjoining Lake,—is obliged to produce his animals for inspection at some point in the latter county, remote from his home and his farm, it is an unauthorized and unjust discrimination, and obnoxious to the constitutional provision above named.

Ward v. Maryland, 12 Wall. 418, is a case where the question of the constitutionality of a statute of Maryland was called in question. This statute provided that all resident traders should take out a license to do business ranging from fifteen to one hundred and fifty dollars, and that a non-resident trader should take out a license, for which he should pay three hundred dollars. The court pronounced the statute void on account of its imposing a discriminating tax, and being in conflict with the foregoing provision of the constitution. To the same effect is Tiernan v. Rinker, 102 U. S. 123. In Walling v. Michigan, 116 U. S. 446, 6 Sup. Ct. Rep. 454, the court says a tax imposed by a statute of a state upon an occupation which necessarily discriminates against the introduction and sale of the products of another state, or against the citizens of another state, is repugnant to the constitution of the United States. Other reasons might be given and authorities cited, but it is unnecessary to further prolong this opinion. I have no doubt but the sole purpose of the act was to exclude foreign dressed meat from the city markets of Indiana. The act, therefore, invades the exclusive right of congress conferred on it by the constitution, and is void. The exceptions to the return to the writ are sustained, and the petitioner is discharged.