B. S. LIVINGSTON & COMPANY, INC., Plaintiff-Appellant, v. BETHLEHEM STEEL EXPORT CORPORATION et al., Defendants-Appellees.

(No. 58097;

First District (3rd Division)—December 5, 1974.

*Rehearing denied January 30, 1975.*

Clausen, Hirsh, Miller and Gorman, of Chicago (Frank Schneider and James T. Ferrini, of counsel), for appellant.

Bradley, Eaton, Jackman & McGovern, of Chicago (Michael A. Snyder, of counsel), for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

B. S. Livingston & Company, an exporter of steel, purchased 2,900 tons of secondary cold rolled steel from Bethlehem Steel Export Corporation for resale to a customer in Italy. Pursuant to agreement, Bethlehem wrapped the steel in waterproof paper and shipped it by the New York Central Railroad to a marine terminal owned and operated by the International Great Lakes Shipping Company at Calumet Harbor, Chicago. International had agreed to unload and store the steel, without cost to Livingston, at its open-air facilities until it could be shipped abroad on a freighter of the Yugoslav Line, for which International was the agent.

The purchase, shipping and storage agreements were made in July 1967, and in August of that year, at Bethlehem's plant in Burns Harbor, Indiana, 775 packages of the steel were loaded on 38 open gondola cars. The cars were in transit 3 to 10 days and were delivered by New York Central to International at seven different times. The first two cars left Bethlehem on August 2 and arrived on August 8; the last three arrived on August 27. It had rained on August 8, 10, 18, 19, 26 and 27. Steel is subject to rust from rain and moist air and that bought by Livingston— secondary cold rolled—had more flaws than primary steel and was more susceptible to oxidation from exposure to water and humid atmosphere. International noticed that packages were wet, the wrappings were torn and that rust was forming on the sides and corners of the steel. On August 16 it reported its observations to Livingston. By August 22, 29 carloads had been delivered and on that date Livingston inspected the steel and confirmed the damage. Despite the damage, Livingston disagreed with International's opinion that the material was not suitable for export to Europe. The contents of the nine cars delivered subsequent to August 22 were in essentially the same condition as that examined by Livingston on the 22nd.

International unloaded the steel from the gondola cars and stored it outdoors on wooden chocks and covered it with plastic and with canvas tarpaulins which were secured by large pieces of wood. Livingston encountered difficulty in consummating the contemplated sale to its Italian customer and the material remained on International's lake-side dock until sometime in October 1967. In the meantime the customer reduced its order to 1,000 tons and Livingston negotiated the sale of most of the balance to a client in Germany. Considerable deterioration had occurred during storage and representatives of the two prospective purchasers examined the steel toward the end of September and rejected it as unsatisfactory. An effort was made to renovate the steel, but it was decided that this would be too expensive. Finally, the entire lot was sold to a warehousing firm at a considerable loss to Livingston.

Livingston filed a complaint for damages against Bethlehem, New York Central and International. The complaint alleged that each of the defendants committed one or more negligent acts: failure to adequately cover the steel from the elements during shipment; failure to properly load and unload the steel from the freight cars; careless and negligent handling of the material; shipment and storage in open rather than enclosed accommodations, and failure to prevent further damages after knowledge that the steel was being damaged. The second count of the complaint alleged that the defendants had exclusive possession and control of the steel and that no damage would have occurred to it if the defendants had exercised due care.

At the close of the evidence, the trial court dismissed the second count. The jury found in favor of Bethlehem, but returned a verdict against New York Central and International and assessed damages of $25,000. Post-trial motions were filed by New York Central, International and Livingston. The court granted a new trial to New York Central as to damages and entered a judgment notwithstanding the verdict for International on all issues. Livingston's post-trial motions were denied.

Livingston appeals from the *n.o.v.* judgment granted International and from the denial of its motion for a new trial against Bethlehem and International on Count II. It does not appeal the new trial New York Central received on the issues of damages.

The case was tried on Livingston's erroneous theory that the negligence of one defendant was the negligence of all. It is apparent that the intent behind this theory was the desire to hold the two financially solvent defendants—Bethlehem and International—liable for any damage caused by New York Central (now the Penn Central) which is presently in financial difficulty. In keeping with this intent, it is to be noted that Livingston does not protest the partial new trial for damages allowed the railroad.

■■ The evidence fully justified the jury's verdict that Bethlehem was not guilty of negligence, but that New York Central and International were. In our view, however, New York Central and International were successive, not joint, tort-feasors.

The steel left Bethlehem's plant in good condition. Each package was bound with steel straps running lengthwise and crosswise around it, wrapped in oil paper selected by Livingston, loaded in enclosed facilities and in accordance with the rules of the American Association of Railroads, and shipped in cars to which Livingston had no objection. To prevent the packages from slipping in the freight cars, they were placed on skids and separated by lengthwise wooden runners. 2" x 4" and 4" x 4" uprights were attached to the skids. No logical inference that there was negligence

on Bethlehem's part can be drawn from the condition of the steel at the time it reached International's terminal. Three railroads participated in transporting the material, the freight cars went through five switching yards and took as long as 10 days to reach their destination, during which time they had been exposed to rain.

On the other hand, the evidence presented at the trial supported the jury's conclusion that New York Central's handling of the shipment and International's handling and storage of the steel contributed to its damage. There was testimony that 102 of the 775 packages were damaged when they arrived at the terminal. Some were torn, some had broken bands, some were wet, some had started to rust and others were bent from being jammed against the ends of the cars. Water dripped from several of them as they were lifted from the cars.

The railroad left the cars about 150 to 200 feet away from the unloading area. International's employees moved the cars by pushing a tractor against the last car in the line. The impact from that car set the next car in motion until the whole line of cars moved. A 2-foot downward slope over a distance of 300 to 400 feet caused the cars to roll to the unloading area. After the first car stopped, each following car bumped the preceding car and stopped. International's superintendent testified that the procedure used to move the freight cars was not forceful enough to constitute a "humping"—a railroad term meaning heavy impact between cars. Still, he noted in his records that he observed humping when he checked the packages. He also testified that the freight cars were not covered or protected between their arrival at the terminal and their unloading. In one instance, three cars that arrived on August 23 were unloaded on the 28th; it rained on the 28th and had rained on August 26 and 27.

In removing the packages from the cars, International used a crawler type crane and attached four clamps to each package before lifting it. The packages were lowered on to a dunnage (6′ x 8′ lengths of 4″ to 4″ lumber) and a forklift truck then carried four of them at a time approximately 150 feet to the storage area where they were placed on dunnages and piled 6 feet high. The piles were covered with plastic that draped over on to the ground and tarpaulins were placed over the plastic; both were then anchored with dunnage.

An official of Livingston watched the employees unload several cars on August 22. He looked at the packages before and after they were removed. He said they were carefully handled and that the forklifts used to transport them to the storage area were large enough to move the steel without bending or twisting it.

At the time International officials agreed to store the steel free of

charge, they thought it would be on their premises about 30 days. Before the steel was shipped from Bethlehem, Livingston knew that the sale to its Italian customer was in trouble, but because it was bound to accept delivery it did not attempt to delay the purchase date. The incompleted sale, Livingston's negotiations with prospective buyers and other factors, prolonged the storage. It was not until September 11 that a letter of credit from its first customer for 1,000 tons was established to Livingston's satisfaction, and on September 15 a sale of some 1,700 tons was confirmed as to its second.

There had been rain on 7 of the August days the steel was on International's dock and there were particularly heavy rains on September 20, 21, 26, 27 and 28. On the 26th a storm tore the covers off the piles of steel. International sent a telegram to Livingston reporting that the steel had been damaged and stating that International was not responsible for damage caused by bad weather. Although there was testimony that International replaced the coverings after the heavy rainstorm on September 26, there was also testimony that they were not replaced until 2 days later.

On September 28, 1967, representatives of the purchasers, accompanied by representatives of Livingston and International, inspected the steel. One of them, a chemical engineer who specialized in marine surveying, testified that some of the covers were flapping in the wind, some had blown off the piles, the wrapping material was torn and the steel was exposed to the elements. He examined 15 packages selected at random and, whether the covering on a package was torn or not, the top sheet of steel in three-quarters of the packages was heavily rusted and the second sheet was spotted with rust. Four packages were sagging at the ends where they overhung the dunnage and 43 contained sheets with nicks and gouges on the edges or riffled corners which, in his opinion, could have been caused while the packages were being lifted or lowered, or by their being swung into a stationary object.

Over International's objections, the jury was instructed that it could not allocate damages among the defendants and it was given a form of verdict compatible with the instruction. This was error—an error that was inadvertently recognized by Livingston, the party responsible for it, in its reply brief:

> "If the defendants were not joint tort-feasors, then the jury should simply have been allowed to apportion damages.
>
> *   *   *
>
> Certainly, the jury in the instant case would face a difficult task in apportioning damages, but that fact does not excuse the trial court's refusal to permit the jury to do so."

■■■ The defendants were not joint tort-feasors. As stated in *Yeazel v. Alexander* (1871), 58 Ill. 254, 262:

> "It is the general rule, that where an act is done by the co-operation of several persons, they may be sued jointly or severally; but one is never liable for the injury of another, unless they act in concert; and several will not be held liable for the acts of one without co-operation, or their conduct naturally produced the acts which resulted in injury. Where the acts of different persons are entirely distinct and separate as to any aid, advice, counsel or countenance, from one to the other, there can not be a joint liability."

New York Central and International did not act in concert, had no contractual relationship between themselves, did not handle the steel at the same time, and bore no responsibility for each other's negligence.

In *Greene Steel & Wire Co. v. F. W. Hartmann & Co.* (1969), 299 N.Y.S.2d 654, 32 App. Div. 2d 538, 1970 A.M.C. 1341, it was held in an analogous situation that a shipping company and a storage company which were sued for damages to coils of wire were not joint tort-feasors. 6,600 coils of steel wire were bought in Germany, shipped to New York and stored on a pier. The coils were rusted when unloaded from the ship and were damaged further during storage. The plaintiff sued the shipping line, its agent and the company which owned and operated the pier. The trial court entered a joint judgment against the three defendants, but the judgment was reversed as to the owner of the pier. The reviewing court held that the owner of the storage facility was liable only for its own tortious conduct; that if it caused any damage to the wire it was successive to and separate from the damage which occurred aboard the ship, and that the plaintiff did not meet its burden of establishing the extent of the damage at the time the wire arrived in New York and the extent the damage was aggravated while in storage.

In its post-trial motion, International requested a judgment notwithstanding the verdict because it was the bailee of Livingston's steel; it contended that the Illinois law of bailment required Livingston to prove that the steel was in good condition when it was delivered to its terminal. It argued that since the evidence and the jury's verdict against New York Central established the contrary, Livingston had not sustained its burden of proof. International also asked for a new trial because the trial court erred in treating the case as one of joint liability and in not instructing the jury concerning the apportionment of damages. As we have seen, the judgment *n.o.v.* was granted and the motion for a new trial was denied. No appeal was taken from the order denying the motion for a new trial.

In this court, International defends its judgment not on the bailor-

bailee relationship, but on the instructions and the form of verdict given the jury which cast Bethlehem, New York Central and itself in the legal posture of joint tort-feasors. Livingston answers that International should not be allowed to take advantage of the latter point because it did not file a cross-appeal from the denial of its motion for a new trial. In this Livingston is correct. However, while International cannot defend its judgment on the ground of the Livingston-induced error from which it did not appeal, neither can Livingston be allowed to take advantage of its own error. Although International's judgment *n.o.v.* must be set aside because of the evidence of its negligence, in the interest of complete justice the damages assessed against it will also be set aside. New York Central was granted a new trial on the issue of damages and that will be our order as to International. (Ill. Const. (1970), art. VI, § 6; Ill. Rev. Stat. 1973, ch. 110A, par. 366(a)(5).) This will enable the two defendants to meet on common ground in contesting the size of the loss sustained by Livingston and to defend in the same trial their own responsibility for that loss.

■■ The evidence showed a gradation of damage to the steel which would make apportionment possible. The fact that the amount of damage caused by the negligence of each defendant may be difficult to ascertain is no reason why damages should not be allowed. *Thomas v. Ohio Coal Co.* (1916), 199 Ill.App. 50. As Professor Prosser has said:

> "The question is primarily * * * the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes. Where a logical basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm which he has in fact caused, it may be expected that the division will be made." Prosser, The Law of Torts 313-314 (4th ed. 1971).

Because of our decision it is not necessary to consider Livingston's alternative contention that error was committed in dismissing Count II of its complaint. Accordingly, the judgment entered in favor of Bethlehem is affirmed.

International's judgment *n.o.v.* will be vacated. The verdict of the jury finding International liable will be reinstated; the verdict as to damages will be vacated. The cause will be remanded for a new trial not inconsistent with the views expressed in this opinion, on the issue of damages.

Affirmed in part, reversed in part and remanded.

McGLOON and MEJDA, JJ., concur.